Good morning, Your Honors. Please, the Court. My name is Mark Weidman. I represent Mr. Rehazade Keshe. I'd like to reserve five minutes in rebuttal, if possible. In this case, a variety of disability and medical leave claims were found not to have disputed issue of material fact on an erroneous determination that there was no disputed issue of material fact of whether Mr. Keshe had a disability or a serious health condition under the medical leave statutes. And there's two aspects to having a disability. One is you had to have some type of medical condition that affects some body system. Here is a musculoskeletal system. And the second part is... Your theory now is not that he's entitled to disability. It's that they fired him because they thought he had a disability, right? That is one of the claims, yes, Your Honor. And since it strikes me that it's pretty plain that there's no genuine issue about that because they didn't know he had a disability. In fact, they asked him for a doctor's note. He didn't provide one, and they didn't believe him as far as I can tell. No, they didn't ask him for a doctor's note, but he did provide one. That was his testimony that he provided one, and he also told them verbally that he had a bad condition, that he'd been to the doctor, that he was put on a medical leave. As I understand about the doctor's note, the doctor says he never wrote one, and the supervisor says he never received one. And the judge said, where's the note? If you're going to prove there's a doctor's note, the best evidence is the doctor's note, not your hearsay testimony about what the doctor's note said. Yes, all of that is true, except for the doctor did not say he didn't write a note. He said he didn't know one way or another whether he writes a note. He doesn't always report in the records whether he writes a note. I thought he said he had not written a note to give this guy two or three weeks off. No. Counsel, if we resolve that issue of fact in favor of your client and we decide there was a note or that he otherwise told his employer that he was hurt, that he hurt his back, isn't another problem you've got that they didn't fire him for that reason? They can show a legitimate non-discriminatory reason because they fired him for violating store policy. I don't believe that, no. Why not? Because his job was to, in his job description, was to apprehend shoplifters, and that's in the testimony. And what they admittedly fired, they admittedly- They have a non-violence policy, right? And they had an investigator's report that indicated he had violated that policy. So even if the report is wrong and they were mistaken, that would still mean they would be entitled to summary judgment. If they relied mistakenly on their understanding that he violated that policy. Their testimony was that it was not against-it was in compliance with CVS's policy to exercise the right of self-defense that does not violate policy, and all their testimony was that he did exercise the right of self-defense. Okay, so getting back to-I don't think we're communicating because this is testimony after he sued them, but at the time, is there any indication that they fired him for anything other than violating that policy? They had an investigator look into it, and the investigator's report said he violated the non-violence policy, is my understanding. That is-the testimony later is about their conclusions at the time. So their conclusion at the time was that he exercised self-defense. But, counsel, they may have been wrong, but that doesn't mean they acted in a discriminatory fashion. If they thought he wasn't acting in self-defense and he really was, that's just not relevant to being discriminatory. It's just about a different topic. No, because they-respectfully, Your Honor, they testified that there's nothing wrong, that the CVS policies allow you to exercise the right of self-defense, that his conduct at the time was exercising the right of self-defense. We're not communicating either, I think. The question is, what was the state of mind of the employer at the time of the termination? And if they thought that he had violated the policy, even if that turned out to be mistaken, that is not a discriminatory state of mind. It may be a negligent or incompetent management state of mind, but it really doesn't advance your case, I guess, is what I'm-at least as far as I'm seeing your argument. I don't think we're miscommunicating with either of you. There's an old, written policy that is not what is the policies that are actually live and active. And the live, active policies is that my client is supposed to-is that CVS allows you to exercise self-defense. That was their state of mind at the time, that he-their state of mind at the time was that he was acting in self-defense and that they do not-their policies was you do not fire someone for acting in self-defense. Counsel, what that would mean-what that would mean, if I'm understanding you correctly, is that their investigator blew it and wrote a report that's incorrect. It reached an incorrect conclusion in concluding that this individual violated the policy. What if he's wrong? Here's what we're trying to get you to grapple with. What if the investigator's report was wrong about what the policy did or did not require? As a matter of law, that would still-you've still got a problem with the McDonnell-Douglas test. I don't believe so, Your Honor, because everyone testified that this was a policy of CVS at the time and they all knew it. Did the investigator-did the investigator testify that way? Yes, yes. The investigator testified that he reached an incorrect conclusion or that that wasn't his conclusion? He testified to what I stated, that you-that our client-that you don't terminate people for exercising self-defense. And then the decision-makers testified as well. More importantly, the decision-makers testified to that, too. Counsel, I need to-may I move to another topic because your time is short? Sure. You have two claims, Numbers 5 and 12, which concern failure to accommodate and a failure to engage in an interactive process. What are the damages that you think are associated with those claims? Because your client continued to work and be paid throughout that time. So what are the damages, if any, from those two claims? Well, he suffered emotional distress because- Well, but, Counsel, then I will ask you about his deposition testimony at page 1302. Aside from the-this is the question-aside from the actual separation in August of 2013, do you attribute anything else to your emotional distress? Answer, no. So as I understand-and the previous question said you suffered emotional distress when you were terminated. And he says, yes. And then he's asked, was there anything else that happened to you that caused emotional distress? And he said, no. With all due respect, you changed the wording of that question. I read it, exactly. But your second phrase is a different wording of that question. No, I read it exactly. But do you attribute anything else to your emotional distress? I don't know. I'm not even sure what that means, to attribute something to your emotional distress. Well, Counsel, I think in context, the way I read that question and answer, let's be fair, he says he's getting his full pay. And he says you didn't accommodate, you didn't engage in this interactive process. And he's asked, were you-did you suffer distress from being fired? Yes, I did. Did you suffer stress from other stuff? No. At least that's how I read it. So is there anything else in the record that demonstrates that he did suffer emotional or other damages on account of Claims 5 and 12? I'm not sure, but I disagree with the reading of that question. I understand that you disagree with it. I'm asking you sort of the flip side now, which is, is there anything else in the record, not in the complaint because we're past the complaint to summary judgment here, is there anything else in the record that supports any damages that flow from Claims 5 and 12? I'm not sure because that was not the basis of the summary judgment being brought or granted, was that there were no damages. That wasn't the basis for the summary judgment. But we can affirm on any ground that is supported by the record, can we not? Well, we would have to be an opportunity to notice an opportunity to be heard on that ground. It should go back to the court to allow us to develop a record of that ground. If it's not brought in the first place, we're obviously not going to be responding to it. So it would be unfair to be hitting us now with that, with a notice and opportunity to be heard. I understand your answer. And so the disability, the second aspect of a disability, so the first aspect was he has a condition that affects the musculoskeletal system, and it was testified to by a doctor he had sciatica. And the doctor's testimony is consistent with the note, by the way. He says he normally puts people off for two to four weeks. He didn't remember exactly what he did with Mr. Keshi. He doesn't always note that in the records. But he normally puts people off for two to four weeks. He presides percocet, which is a pretty strong painkiller. I don't know what you're doing. Are you trying to convince us there's a material issue fact about whether he is disabled? Yes. Okay. Because that was a large basis for the granting of a summary judgment. I thought your basis was not that he was disabled, but that he was fired in retaliation for filing a disability claim. That is another claim. There's a variety of disability and medical leave claims. There's failure to accommodate. There's failure to engage in the interactive process. There's that he was terminated because of a disability. He's getting his disability pay, right? Or he got his disability pay? He got some disability out of the fact, yes. Let me back up to what's bothering me here the most, and that is the self-defense and the scuffle in the store. As I understand it, looking at the record now, there's a genuine issue of fact on whether he acted in self-defense. Because some employees say he didn't, some say he did, and he says he did. I watched the video, and I couldn't see it, but I'm not on the jury. To me, it looked like he tried to apprehend the shoplifter by force and held him down until the cops came and then handed him over to the police. But some people say otherwise. Certainly, if a shoplifter came at him with a broken bottle, based on all the evidence, CVS would have said, well, we wouldn't have fired him for defending himself against a shoplifter coming at him with a broken bottle. And that's basically your theory. Have I got it right so far? Yes. Okay, now let me get to the crux of my question. If what CVS believed when they fired him was that no shoplifter came after this guy with a broken bottle or with a lifted bottle to hit him, based on CVS's examination of the case at the time, they concluded, he just tried too violently to apprehend the shoplifter. We ended up with a scuffle in the aisle, and that's just the kind of thing our no-store violence is meant to prevent. So he's gone. If that's what they thought, and there's no genuine issue about whether they thought that, there may be a genuine issue about whether they were right, but there's no genuine issue about whether they thought that, why doesn't the public policy argument disappear? And why doesn't the retaliation for disability disappear? And why isn't it simply a case of, they fired him because they mistakenly thought he got into a scuffle in the aisle, but he didn't have to get into. It would if that's what they mistakenly thought. But my point is, by bringing out all their testimony that he acted in self-defense, is that's not what they mistakenly thought. They knew and they testified that they knew to the contrary. All of them testified. Every employee, by the way, testified. Not some of them. Everyone testified, including the ones that made the decision, that he was acting in self-defense. What does that mean? What did they... Well, they all had the information that they came at him with the bottle, that he tried to hit him. They didn't produce that part of the video. They produce it when they're already in the middle, and he's trying to continue to restrain him from kicking and pushing. All of them were involved, by the way. No, no. I saw the part of the video where the guy is walking in his direction. But the initial... He's walking in his direction, and then he apprehends the guy in blue. No, you do not see. You can review that again, because you do not ever see. They do not have the part where they initially come in contact. It jumps from another angle. They do not have the part where he has the bottle over his head, where he's swinging it down. Everyone testified that that's what they saw. Everyone testified that that's what was reported. Everyone knew about that. And all the other employees, by the way, had got into interactions with this gentleman as well, and none of them got fired. Counsel, counsel, you're about 30 seconds from the end of your time, and if you want any rebuttal time, this will be the time to save it. Thank you very much, Your Honor. Good morning, Your Honors. May it please the Court. I'm Jody Landry on behalf of the Pelley CVS Pharmacy, Inc. I want to address... Could you speak a little louder, please? I'm sorry. I want to address a couple of points opposing counsel just made. With respect to your questioning of him regarding whether or not he can prove any damages, with respect to the alleged failure to provide an accommodation, he said we had not raised that in the motion for summary judgment. We actually did raise that. It's in the record at page 1222. That was raised below. For both claims 5 and 12, or just claim 5? Oh, I'd have to go back and look at it, but I did find that it was argued with respect to that. Okay. I would check that out. With respect to counsel's comment that CVS's policy did not prohibit this conduct, it's clear in the record that it did. On page 1318 of the record, there is CVS's policy about shoplifting and robberies. You mean the written policy? Yes, sir. I thought the testimony that he was citing was our understanding of our policy is that you can engage in self-defense regardless of the written policy. I believe, too, that individuals testified, as I best recall, Your Honor, that if someone was being attacked, obviously they could defend themselves. That wouldn't violate the policy. But the policy I was referring to is the policy that says, if you suspect shoplifting, alert your supervisor. Again, do not pursue a shoplifter out of the store, and do not physically engage with the shoplifter. That's in page 1318 of the record. And then page 1320 of the record has the policy against violence in the workplace. Who was the decision-maker to terminate his employment? The decision-makers would be, I believe, the district manager, Rashid Ramaman, obviously the loss prevention manager who was involved, and then Michelle Hernandez, who was the HR person. There's three people who made the decision? They were all involved in approving the decision. Do you have ER sites to indicate that they relied on the conclusion of the investigation? I can get those for you, but I know we do have it. And I have the termination paperwork, which is at page 1377 of the record, which has the district manager's name on it, and it would have been reviewed and approved by HR. And they did rely on the investigator's report to reach the conclusion. And nowhere in here does it indicate that they concluded he was acting in self-defense, whether they concluded that he violated policy because he showed excessive force. Right. We've got that page. Okay. So I think this case comes all back with respect to most of the claims, to the point, Your Honor, we're making with opposing counsel. Even if you give him the benefit of the doubt that he could state a prima facie case on any of the discrimination, retaliation, or wrongful termination public policy claims, it comes down to can he establish pretext? Because CVS has stated the legitimate. Did the video – there are usually multiple surveillance cameras in a place where there are surveillance cameras. Did the video flip from one to the other so that it would be possible for the shoplifter to come at him with a raised bottle and we wouldn't see it on the video? My understanding of the video, Your Honor, is that there are two cameras that captured things. There was one that showed the front entrance of the door, and I believe the opposing counsel had that submitted to you, and you don't really see anything from that angle. And the other camera was faced at a register area, which only kind of focuses on the self-register area, and you see him coming in and out of that. But there isn't like the camera was moving or anything. It's a set still camera. So there are some – there is a split second where the altercation starts that is not caught on the camera. And that's what's opposing counsel's point, is because you can't see the shoplifter come at the – Correct. That's his point. But our investigator talked to the appellant. He took his statement. He never made those claims that he was being attacked or that he was acting in self-defense. He interviewed the other witnesses. He looked at the video, and he concluded, based on that, that he had violated the policy. That report was made to the district manager and HR, and ultimately the termination was approved. If we – if opposing counsel can prove that it was mistaken or wrong, that doesn't matter under the law. He has to prove it was a pretext for some unlawful motive, and there simply is no evidence of that. There are a couple other claims that don't fit into that category, but that should cover the 1st, 2nd, 3rd, 4th, 6th, 7th, 10th, 11th, and portions of the 8th and 9th cause of action. With respect to the failure to accommodate, the district court didn't reach this issue, but I do believe there is a credible basis to find he didn't properly exhaust administrative remedies. But I'm going to skip to, I think, what is a more compelling reason. He admitted he didn't need a leave, which is the accommodation he says he needed. On page 1258 of the record, he said he never needed a leave. If you don't need a leave, why do you need an accommodation for a leave? And the other point Your Honors are making is there are no damages that he suffered. He didn't lose any pay, and he admits it didn't cause him emotional distress. For the failure to accommodate and failure to engage in the interactive process. Exactly. Okay. With respect to the 8th and 9th causes of action, which is alleged failure to provide leave, I think that's easily disposed of because, as I just said, at page 1258 of the record, he admits he never applied for leave because he, quote, never needed one. So the 8th and 9th causes of action fall on that. With respect to the 12th cause of action for failure to engage in the interactive process, another basis to uphold that would be there was nothing to be gained by the interactive process here. He said he didn't need leave, which is the only thing the alleged note was supposed to say. On the other hand, he said he didn't need a leave. He also submitted a declaration to the court, which is at page 1029 of the record, where he said he was able to do all his essential job. But he said both things, counsel. He also said that he couldn't lift, bend. Isn't there a disputed issue of fact about that? Lifting his deposition testimony at 7 ER 1269, lifting, walking. In response to the question, what parts of your job were you not able to do? He may have said that in his deposition, but he submitted a declaration saying he actually did continue to perform his job and he didn't need any help, didn't ask for any help. The only thing he ever told either manager was one that I hurt my back, but I don't think it's serious to let him go home for two days. And the other time he allegedly told the manager I have a back issue, but he didn't say he needed any help to do his job. Well, and then he, but that's a disputed issue of fact.  Okay. Thank you, Your Honor. Then I would fall back on the issue regarding the failure to properly and timely exhaust and that the second incident is not asking for an accommodation by just saying my back is bothering me. The final cause of action I think is a failure to prevent discrimination and harassment. And that easily falls if the court finds for us on the other claims. Also. Because of the McDonald Douglas issue. Correct. Also, if there is no, we believe the case that holds, there's no private right of action for that. But more importantly, even if you get to the last reason, the record is replete with CBS's policies against discrimination, retaliation and lawful conduct in the workplace. Appellant admitted he was well aware of those policies and appellant never reported to anybody that he was having any issues or concerns. So I believe the record, there was a basis to uphold summary judgment on all the claims, either on the same basis as a district court or on any other basis that's  Let me get you back to the workplace violence for a moment. I want to make sure I understand this right. And I may not. As I understood it, when I read the written policies and the shall I say the bare facts of the investigation and discharge, the theory of the discharge was that an employee who engages in any violence at the workplace gets fired. And the defendant then contended, well, that can't be that simple, consistent with California policy because an employee is entitled to self defense. And I thought about that and I thought, well, if somebody is coming at you with a broken bottle, surely you could push a chair in between you or card or something just to keep them from cutting you up with a broken bottle. It seems absurd to say, no, you can't do that. You have to just suffer it. But now I understand that they fired him for excessive force rather than any force. And they're saying that they really don't have a policy, that it says they really don't have the written policy. That's not their real policy. Their real policy is just not too much force or beyond what you need for self defense. And at this point I get a little lost. I don't know exactly why they fired him and what the policy is. I read the written policy and that would seem to mean just what the appellant says it means, which doesn't make any sense to me. It means if somebody is coming at him with a broken bottle to hit him, he can't shove a cart between him and the broken bottle guy. There was no finding that that's what he did. And I believe the two managers that he asked if somebody was being attacked, could they defend himself? Would that violate the policy? Well, if the policy is no use of force in self defense, then when they're deciding what to do about it, the three of them might be arguing, well, you can see why I did this. And somebody would say, it doesn't matter. We have zero tolerance for any kind of violence in the workplace. Whether he's just protecting himself by shoving a cart between him and the guy or by wrestling with him so he doesn't really hurt him but he just holds him down or whatever, we don't care. If he had a physical contact, he's gone. And what you just answered a moment ago makes me think that's what the policy is. The policy is what's in writing. Two managers being asked if they thought there was a policy that could be testified to that. That wasn't a written policy regarding that. But I don't believe there is a public policy claim in California with respect to this. So you're saying that they did have the written policy, no physical force, and that that's the only policy, and it really doesn't matter what the managers testified to at deposition. And if you work for CVS, you can't use any force to defend yourself from an attacker. That's what the written policy says. I know it's what the written policy says, and you're saying that's the only policy there is. Yes. So why isn't that against public policy? I don't believe it. I don't. Let me back up. I mean, let's take a somewhat more dramatic. Is that the claim here, though? No. The claim isn't that the policy is against public policy. The claim, as I understand it, is that he was actually fired for an alleged disability, which is against public policy to do. My understanding of his claims is he admitted he understood our policies, he was trained on the policies, and his counsels never claimed that our policies against not apprehending shoplifters or no violence in the workplace were unlawful. He contends he exercised his right to self-defense, and that's why we terminated him. That is not why CVS terminated him. CVS conducted an investigation, and it concluded based on that entire investigation that he did not exercise self-defense. Rather, he violated policy by going after a shoplifter, which was against CVS policy, and then after he apprehended him, he used the word was excessive force by wrestling to the ground, choking him and things of that nature. Why would they have concluded that he didn't act in self-defense and that he used excessive force if the policy is that self-defense doesn't matter and any violence by excessive force is prohibited? I don't know why the investigator wrote it up that way, Your Honor. The investigator wrote it up, violation of company policies and procedures, right? That's what you're relying on, this report. That's the report. I was reading from the determination paperwork a moment ago. Right. No, I appreciate that, but to go to Judge Kleinfeld's point, he could have been wrong, right? This investigator could have been wrong about whether this conduct violated the policy. That's my understanding of your argument. Right. And I think it's an important point. I appreciate your backing up. I think opposing counsel raises some legitimate arguments that this investigator may have been wrong. But even if he was wrong, as long as he didn't reach the conclusion for an unlawful reason. Or pretextual reason. Or pretextual reason. And there's absolutely no evidence of pretext in the record. At best, he's saying that he thinks he didn't do a good enough job or he's not right, but the case law has well established that. That is not sufficient to establish pretext. And again, I don't think this could even rise to a public policy claim. If Your Honors would like me to address that, I'm happy to. I think it's fully addressed in the briefing. Thank you. Thank you. Thank you. Mr. Wideman, you have a very small amount of time remaining. I'd like to make several quick points. One is there is a claim for he was fired in wrongful criminalization of violence in public policy for the exercise of self-defense. Two, he requested leave for his disability several times. That's in his depot. It's extensively briefed there. Three, as far as the McDonnell Douglas pretext, there was timing based on how close in time the firing was from the request for letting know the condition. And there's plus every other person that was involved in this interaction had physical contact and tried to stop this customer. Wait a minute. Back up to what you said. How close was the firing to his report of his back condition? Less than a month. And every other, none of them were fired. It was completely unequal treatment. There was a cashier that physically tried to stop him. Counsel, it seems to me the obvious response to that is because we've watched the video, is that once he jumps on the guy and there's an altercation, it's not surprising that the other employees jump in to try to control the situation. No, the cashier. It seems to be qualitative. So just to make sure you can respond to my question, I'll just finish it. Okay. It seems to me to be qualitatively different to initiate the physical confrontation. There were three prior to his interaction with them. The cashier, Bogdossian, and Tello all tried to stop. Physical contact? Physical contact? Yes. All of them tried to stop. Well, one with the arm out. Bogdossian grabbed him around, put his arm in front of him and grabbed him around. Did anyone else tackle him to the ground, however? No. The only reason my client was doing that was because he was just trying to restrain him from stopping. The testimony was the guy continued to push and hit. And as they're on the ground, the other two, the security guard is grabbing the guy's leg, trying to hold it. Tello is grabbing the arm as this guy continues to try to attack our client. And initially he was within inches of him hitting him with the bottle coming down, so he grabbed them. I mean, we can all, in retrospect, say, oh, gee, you know, you should do something less. But when you're in that kind of physical danger, you've got to do something. Counsel, counsel, counsel. Why doesn't that mean the investigator was wrong? The investigator did not make the decision to terminate. The other people did, and they knew all this information, and the investigator knew all this information. Are you arguing pretext? I am arguing pretext, absolutely. Every time I talk about they knew it was self-defense, I'm saying this investigation conclusions are just pretextual. They're not false. I don't believe they believed that. They believed he was acting in self-defense. And he said as soon as he felt the guy was not attacking him anymore, as soon as he got him calmed down, he let him go. Okay, counsel, counsel, you've well exceeded your time. Thank you very much. The case just argued is submitted, and we thank you both.
judges: Kleinfeld, Graber, Christen